IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

JOSE DURAN, )
)
    Plaintiff, )
)
v. ) Civil Action No. 3:19-cv-930–HEH
)
MS. HOOVER, *et al.*, )
)
    Defendants. )

**MEMORANDUM OPINION**
**(Adopting Report and Recommendation and Dismissing Action)**

Jose Duran ("Duran" or "Plaintiff") filed this civil rights action on December 28, 2019. (ECF No. 1.) On August 2, 2022, the Magistrate Judge issued a Report and Recommendation ("R&R," ECF No. 68) recommending that Duran's sole remaining claim against Correctional Officer Defendant Hoover ("Defendant Hoover") be dismissed with prejudice because Duran failed to exhaust his administrative remedies, as required under the Prison Litigation Reform Act ("PLRA"). Duran has submitted an OBJECTION/MOTION TO RECONSIDER (ECF No. 69) and an accompanying "Affidavit" (ECF No. 70). For the reason set forth below, Duran's Objection will be overruled and the Report and Recommendation will be accepted and adopted.

    **I.    THE REPORT AND RECOMMENDATION**

The Magistrate Judge made the following findings and recommendations:

    **[A.]    PROCEDURAL HISTORY**
Plaintiff, a Virginia inmate proceeding *pro se* and *in forma pauperis*, filed this civil action under 42 U.S.C. § 1983 on December 18, 2019.[1]

---

    [1]    42 U.S.C. § 1983 provides, in pertinent part:

(Compl., ECF No. 1.) On June 4, 2020, the Court directed Plaintiff to file a Particularized Complaint, as required by the PLRA. Upon review of the Particularized Complaint, the Court concluded that Plaintiff had failed to state a claim for relief against four of the named defendants and dismissed the case as to them. (ECF No. 26.) Conversely, the Court concluded that Plaintiff had stated a claim against Defendant Hoover and permitted Plaintiff to proceed on his excessive force claim against her. (*Id.* at 2–3.) In that claim, Plaintiff alleged that Defendant Hoover violated his Eighth Amendment rights on September 4, 2019, at Sussex II Prison ("Sussex II"), when she allowed her canine to bite him even after he complied with her order to lie on the ground. (Particularized Compl. ¶¶ 16–18, ECF No. 14.)

On August 2, 2021, Defendant Hoover moved for summary judgment, arguing that Plaintiff's claims were barred because Plaintiff failed to exhaust his administrative remedies as required by the PLRA. (ECF Nos. 35 & 36.) In support of the motion, Defendant Hoover claimed that, although Plaintiff filed an informal complaint regarding the September 4, 2019 incident at Sussex II, he failed to timely submit a regular grievance and pursue it through all levels of administrative review. (ECF No. 36, at 4–5.)

By Memorandum Opinion (ECF No. 49) and Order (ECF No. 50) entered on February 2, 2022, the Court denied Defendant Hoover's Motion for Summary Judgment, finding that a genuine issue of material fact existed as to whether Plaintiff had properly submitted a regular grievance. *Duran v. Hoover*, No. 3:19CV930, 2022 WL 319834, at *4–*5 (E.D. Va. Feb. 2, 2022). The Court explained that in the materials filed by Plaintiff in opposition to Defendant Hoover's motion, Plaintiff swore that, while he was in segregation at Sussex II, he gave a regular grievance regarding the September 4, 2019 incident to Officer T. Callahan. *Id.* at *3. The Court also noted that the record contained "a copy of a Regular Grievance that appears to relate to" the incident and that "the Regular Grievance was stamped as 'RECEIVED' on November 1, 2019, which appears to be the date that it was received by prison officials." *Id.* at *3. Thus, on the record before it at that time, the Court could not conclude as a matter of law that Plaintiff failed to exhaust his administrative remedies because "an argument could be made that this administrative remedy was not available" to Plaintiff if "Officer Callahan, or some other party down the line, either through inadvertence,

---

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

2

negligence, or malfeasance, delayed the submission of [Plaintiff's] Regular Grievance." *Id.* at *4 n.6.

After denying the motion, the Court referred the case to the undersigned "for an evidentiary hearing solely to determine whether [Plaintiff] properly exhausted his administrative remedies, as required by the PLRA." (ECF No. 56, at 4.) On July 19, 2022, the undersigned held the required evidentiary hearing on the issue of exhaustion.

### [B.] APPLICABLE LAW

Before an inmate can bring a lawsuit challenging the conditions of his confinement, he must first exhaust his administrative remedies. "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This language "naturally requires a prisoner to exhaust the grievance procedures offered, whether or not the possible responses cover the specific relief the prisoner demands." *Booth v. Churner*, 532 U.S. 731, 738 (2001).

Generally, in order to satisfy the exhaustion requirement, an aggrieved party must file a grievance raising the claim and pursue the grievance through all available levels of appeal, prior to bringing his or her action to court. *See Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006). Section 1997e(a) "requires proper exhaustion," *id.* at 93 (emphasis added), which "demands compliance with an agency's deadlines and other critical procedural rules," *id.* at 90, "so that the agency addresses the issues on the merits." *Id.* (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). The prison's grievance procedures therefore "define the boundaries of proper exhaustion." *Jones v. Bock*, 549 U.S. 199, 218 (2007). Exhaustion is mandatory, and courts lack discretion to waive the exhaustion requirement. *Porter v. Nussle*, 534 U.S. 516, 524 (2002).

However, "an administrative remedy is not considered to have been available if a prisoner, through no fault of his own, was prevented from availing himself of it." *Moore v. Bennette*, 517 F.3d 717, 725 (4th Cir. 2008) (citations omitted). The United States Court of Appeals for the Fourth Circuit explained that,

> to be entitled to bring suit in federal court, a prisoner must have utilized all available remedies in accordance with the applicable procedural rules, so that prison officials have been given an opportunity to address the claims administratively. Having done that, a prisoner has exhausted his available remedies, even if prison employees do not respond.

*Id.* (internal citation and quotation marks omitted) (citing *Woodford*, 548 U.S. at 90–91 and *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006)).

3

"Once a defendant presents evidence of a failure to exhaust, the burden of proof shifts to the plaintiff to show, by a preponderance of the evidence, that exhaustion occurred or administrative remedies were unavailable through no fault of the plaintiff." *Lordmaster v. Augusta Corr. Ctr. Pers.*, No. 7:13-CV-00506, 2014 WL 3359389, at *1, n.2 (W.D. Va. July 9, 2014) (citing *Tuckel v. Grover*, 660 F.3d 1249, 1254 (10th Cir. 2011)). Thus, in the instant case, the undersigned must determine whether Plaintiff exhausted his administrative remedies by timely filing a grievance at Sussex II and pursuing it through all available levels of appeal, or whether his failure to exhaust can be excused because those procedures were made unavailable to him.

### [C.] FACTUAL BACKGROUND
#### [1.] Virginia Department of Corrections Grievance Procedures

Central to the Court's inquiry is the Virginia Department of Corrections' grievance procedures. At the evidentiary hearing, Defendant Hoover introduced a copy of the "Offender Grievance Procedure," Operating Procedure 866.1 that was in effect on the date of the September 4, 2019 incident. (Tr. 13–14; Ex. 18).[2] This procedure outlines the process for resolving inmate grievances regarding the conditions of the inmate's confinement. (Ex. 18 at IV.M.1.) The procedure sets forth the steps the inmate must take in order to have his or her grievances addressed, the time limitations for taking those steps, and other applicable rules relevant to the issue of exhaustion. (Ex. 18 at IV–VII.)

According to Operating Procedure 866.1, before an inmate may submit a grievance, he must make a good faith effort to resolve the grievance informally. (Ex. 18 at V.A.1.) Generally, to fulfill the good-faith-effort requirement, the inmate must submit an informal complaint. (Ex. 18 at V.A.1–2.)

If the informal complaint does not result in resolution of the issue, the inmate may proceed to the next step and file a regular grievance. (Ex. 18 at VI.A.2.) An inmate must file a regular grievance "through the facility mail system to the Facility Unit Head's Office for processing by the Institutional Ombudsman/Grievance Coordinator." (Ex. 18 at VI.A.2.b.) When submitting the grievance, the inmate must attach a copy of the informal complaint or other documentation demonstrating his attempt to informally resolve the issue. (Ex. 18 at VI.A.2.a.) A regular grievance must be filed within thirty days from the date of the incident or occurrence, or the discovery of the incident or occurrence. (Ex. 18 at VI.A.1.)

Before the substance of a grievance will be reviewed, prison officials first conduct an "intake" review of the grievance to ensure that it meets the

---

[2] All references to exhibits contained herein are to exhibits introduced at the evidentiary hearing.

4

published criteria for acceptance. (Ex. 18 at VI.B.) If the grievance does not meet the criteria for acceptance, prison officials will complete the "Intake" section of the grievance and return the grievance to the inmate within two working days. (Ex. 18 at VI.B.4.) If the inmate desires a review of the intake decision, he or she must send the grievance form to the Regional Ombudsman within five calendar days of receipt. (Ex. 18 at VI.B.5.)

If the grievance meets the criteria for acceptance, the grievance will be logged into the system on the day it is received, and a "Grievance Receipt" will be issued to the inmate within two working days. (Ex. 18 at VI.B.3.) The facility's Institutional Ombudsman or Grievance Coordinator will review the grievance's content and establish an investigation plan. (Ex. 18 at VI.C.1.b.) Once the investigation is completed, the facility will provide the inmate with a response. (Ex. 18 at VI.C.1.c–d.) The response must include a determination as to whether the grievance was founded or unfounded and, if founded, what remedy was or will be taken. (Ex. 18 at VI.C.1.d.)

The facility's review of the grievance represents the first level of review available to the inmate. If the inmate is dissatisfied with the Level I response to the regular grievance, he may appeal the decision to Level II. (Ex. 18 at VI.C.2.) Level II appeals are investigated by the Regional Ombudsman. (Ex. 18 at VI.C.2.a.) For most issues, Level II is the final level of review. (See Ex. 18 at VI.C.3.)

Pursuant to the policy, "[a]n offender meets the exhaustion of remedies requirement only when a Regular Grievance has been carried through the highest eligible level of appeal without satisfactory resolution of the issue." (Ex. 18 at IV.O.2.)

**[2.] Testimony of Rhonda Langford, Grievance Coordinator at Sussex II State Prison**

Ms. Rhonda Langford testified on behalf of Defendant Hoover. Langford has been a Virginia Department of Corrections' employee for 24 years and currently serves as the Grievance Coordinator at Sussex II State Prison where she is responsible for addressing inmate complaints. (Tr. 12:5–20.)

[a.] <u>Langford's Handling of Informal Complaints and Grievances at Sussex II</u>

Langford testified regarding Operating Procedure 866.1, and her role carrying out that procedure at Sussex II. She testified that informal complaint and regular grievance forms are available throughout the prison, including in segregation. (Tr. 14:21–22; 18:16–17.) Langford explained that an inmate submits one of these forms by placing the form in one of the designated boxes in the lobby, which she checks daily. (Tr. 15:1–3). Langford testified that inmates in segregation cannot access the lobby, so must give their forms to

5

prison officers who then place them in a mail bag, which Langford also picks up daily. (Tr. 15:4–5.)

Langford testified that when she receives an informal complaint, she date-stamps it and enters it into CORIS—the prison's system used for tracking prisoner grievances—where it is assigned a tracking number. (Tr. 15:10–18.) CORIS produces a receipt for the inmate, which contains a summary of their complaint and the deadline for the prison to respond. (Tr. 15:24–16:1.) Langford then distributes the receipt to the inmate and the informal complaint to the relevant department. (Tr. 15:10–12.) After an informal complaint has been addressed by the relevant department, she makes a copy of it, places it in the inmate's physical grievance file, and sends the original back to the inmate. (Tr. 18:7–8.)

Langford explained that if an inmate is not satisfied with the outcome of an informal complaint, he can file a regular grievance within thirty days of the date of the incident. (Tr. 18:11–12; 19:1–6.) When an inmate files a regular grievance, he must attach either the returned informal complaint or the receipt he was provided when he filed his informal complaint. (Tr. 18:18–19:15.) Like informal complaints, if an inmate in segregation wants to file a regular grievance, the inmate must give his regular grievance form to a prison officer, who will then place the form in a mail bag. (Tr. 41:12–14.) Langford testified that officers "constant[ly]" pick up the mail from inmates in segregation and that she has never experienced a delay in receiving mail from inmates in segregation under this system. (Tr. 41:15–42:2.)

When Langford receives a regular grievance, she date-stamps it and makes an "intake decision," meaning that she decides whether it is an acceptable grievance or one that must be rejected for a specified reason, such as, for example, lacking sufficient information. (Tr. 19:23–20:21.) If the grievance is rejected, Langford gives the original grievance back to the prisoner with a written explanation explaining why it was rejected. (Tr. 21:4–6.) Langford testified that a grievance that is rejected at intake is not logged into CORIS or assigned a tracking number. (Tr. 22:1–6.)

If the regular grievance meets the criteria for acceptance, Langford logs the grievance into CORIS, where it is assigned a tracking number, and she retains a copy for the inmate's physical file. (Tr. 21:3–5; 22:16–25.) Langford testified that she then places a receipt for the regular grievance in the prison's mail bags on the same day that she processed the grievance, allowing the inmate to receive the receipt either that day or the following day. (Tr. 23:4–5; 40:11–19.) For accepted regular grievances, the prison undertakes an investigation. (Tr. 23: 9–13.) Once the investigation is complete, the regular grievance is signed by the warden, closed out in CORIS, and the original copies are returned to the inmate. (Tr. 23:17–21.)

6

If an inmate is not satisfied with the outcome of the grievance process, he can pursue a "Level II" appeal to the Regional Ombudsman by placing his appeal in an envelope and writing "Regional Ombudsman" or "appeal." (Tr. 24:4–17; Tr. 24:20–23.)) According to Langford's testimony, inmates cannot skip submitting a regular grievance at the facility level and proceed straight to the Regional Ombudsman as that would not be in compliance with Operating Procedure 866.1. (Tr. 24:24–25:9.)

[b.] Langford's Testimony Regarding Plaintiff's Informal Complaints and Grievances

Langford testified about the informal complaints and regular grievances filed by Plaintiff. In so testifying, Langford relied upon a report she ran from the CORIS system, known as an Offender Grievance Report (the "Grievance Report") (Ex. 22.) Langford explained that the Grievance Report is a list produced by CORIS of each informal complaint and regular grievance filed by Plaintiff between April 6, 2010, and November 8, 2021. (Tr. 36:13–23.) The Grievance Report notes the type of form submitted (i.e., informal complaint or regular grievance), the date that the form was received by the prison, a summary of the issue and the prison's response, and the date that the issue was closed out in CORIS after the matter was resolved. (Ex. 22; Tr. 28:16–29:13.) The Grievance Report also shows the tracking number assigned to each informal complaint or grievance. (Ex. 22.) Langford explained that informal complaints and regular grievances submitted to Sussex II have tracking numbers that begin with "SXII," followed by the year, followed by either "INF" or "REG" for informal complaint or regular grievance, respectively, followed by a unique identifying number, which is sequentially assigned to forms as they are filed each year (Tr. 28:21–29:4; 31:18–22.)

Relying on the Grievance Report, Langford testified that between September 4, 2019 (the date of the incident), and early October 2019, Plaintiff filed five informal complaints. (Ex. 22; Tr. 31:4–8.) Those informal complaints were received from Plaintiff on September 11 and 12, twice on September 20, and September 27. (Ex. 22.) The prison responded to each of these informal complaints on September 30, 24, 25, and October 7 and 8, respectively, and those responses are reflected on the Grievance Report. (Ex. 22.) Langford testified the prison had not received any regular grievance corresponding to any of these informal complaints that was accepted at intake. (Tr. 31:9–12.)

Langford specifically addressed an informal complaint received from Plaintiff related to the September 4, 2019 incident. That informal complaint was file-stamped as having been received by the prison on September 12, 2019, with an assigned tracking number SXII–19–INF–04780 ("Informal Complaint 4780") (Ex. 21). (*See* Tr. 32:13–21.) In Informal Complaint 4780, Plaintiff stated: "While I laid on the floor K9 Officer Hoover allowed

7

Her K9 dog to grab ahold of me. I wasn't a threat to no one. . . . [S]he still allowed her dog to bit me not ones [sic] but twice. . . . Excessive use of force." (Ex. 21.) At the bottom of Informal Complaint 4780, a prison official responded, stating: "The use of canine has been documented and reviewed in accordance with use of force policy." (Ex. 21.) The response is dated September 24, 2019. (Ex. 21.) Langford testified that the prison provided Plaintiff with a receipt after receiving Informal Complaint 4780. (Tr. 33:12–24; *see* Receipt (Ex. 3).) Relying on the Grievance Report and her knowledge of the Plaintiff's physical file at Sussex II, Langford testified that Plaintiff never filed a regular grievance regarding the September 4, 2019 incident that was accepted at intake and appealed through all available levels of review. (Tr. 37:18–25.)

Langford testified regarding her knowledge of Exhibit 9, which appears to be a regular grievance regarding the September 4, 2019 incident. The undated document is signed by Plaintiff. (Ex. 9.) Langford testified that the document was not in Plaintiff's grievance file at the prison. (Tr. 34:20–35:3.) She testified that Exhibit 9 lacked a log number, indicating that it was not accepted at intake. (Tr. 34:20–22.) The form, which is typically a double-sided form, was also missing a backside, where the prison would have explained why the grievance was rejected at intake, if that had been the case. (Tr. 34:23–24.) When questioned about a date stamp at the bottom of the regular grievance, noting receipt on November 1, 2019, Langford testified that she was unsure whether the stamp belonged to an individual at the prison or the Regional Ombudsman's office. (Tr. 34:7–17.)

Langford also testified about the options an inmate would have if the inmate had submitted a regular grievance but had not received a receipt or response to the regular grievance. Specifically, Langford testified that the inmate has various options he can pursue to determine if the grievance office actually received his grievance. (Tr. 48:4–25.) The inmate could send an inquiry to her office to ask about the status of the grievance he believed he had properly submitted, submit a second regular grievance before the deadline, or submit an Offender Request.[3] (Tr. 21:20–23; 48:4–25.) However, Langford added that it was very rare for an inmate to not receive a response, explaining that "unless [the inmate] moves cells," she returns "the mail exactly where they sent it from. And they have their cell up there [on the form], their bed log and where they can be located. They usually get their mail back the same day." (Tr. 48:15–19.)

**[3.] Testimony of Plaintiff**

Plaintiff testified that he properly followed all of the steps of the grievance process. He testified that following the September 4, 2019 incident, he submitted Informal Complaint 4780 on September 11, 2019, and

---

[3] Plaintiff testified that an Offender Request is a form that an inmate can use to ask a question regarding the institution or the grievance process. (Tr. 57:2–6.)

8

that he received a receipt for that submission. (Tr. 51:8–22; *see* Ex. 21.) He also testified that he received the prison's response to Informal Complaint 4780 around September 26, 2022, and on that same day, he filled out a regular grievance and gave it to Officer Callahan to submit. (Tr. 52:5–12; 53:20–54:9; *see* Ex. 21.) Plaintiff expressed that, because he was in segregation, "[a]fter it leaves [his] hands into the officer's hands, [he] ha[s] no control of what they do with the mail." (Tr. 53:6–11; 61:1–8.) He testified that he had no control as to whether "they're going to take the time to go to the lobby and put that grievance in the grievance box." (Tr. 61:5–8.) Plaintiff testified that he knew that he was required to submit a regular grievance regarding the September 4, 2019 incident no later than October 4, 2019 and believed that he had complied with that requirement by giving the regular grievance to Officer Callahan on or about September 26, 2022. (Tr. 53:20–54:12.)

When questioned, Plaintiff admitted that after submitting a regular grievance, the prison would normally either provide him with a receipt or a notice that his grievance had been rejected. (Tr. 61:25–62:5.) He agreed that he did not receive either regarding the excessive use of force regular grievance he claims to have submitted. (Tr. 62:6–9.) When questioned regarding why he took no action despite the not receiving a receipt, Plaintiff testified that he was sent to the hospital for medical care for three days for treatment for his infected leg, after which he moved to a different cell. (Tr. 62:12–23.) He indicated that he believed that the receipt for the grievance may have been mailed to his old cell and thus never came to him. (Tr. 62:18–20.)

Plaintiff testified that he knew that the prison had thirty days to respond to his regular grievance, and he did not receive a response in that time, leading him to submit an appeal to the Regional Ombudsman's office. (Tr. 54:14–23.) Plaintiff testified, "When you fill out a regular grievance, . . . you have 30 days to hear a response back. I didn't hear a response. So at that point I didn't know what else to do." (Tr. 54:14–18.) He testified, "And therefore, I'm thinking I'm going to wait the 30 days when the deadline is over, or close to over, so I could write to let them know, hey, this is going on." (Tr. 62:20–23.) He also testified that he was aware that "the deadlines was [sic] crucial so [he] had to stay on top of them." (Tr. 54:20–21.)

Thereafter, Plaintiff provided extensive testimony regarding the steps he took after October 4, 2019—the thirty-day cutoff date for filing a regular grievance. Plaintiff introduced a letter he sent to the Regional Ombudsman's Office, addressed to "T. Harvey" and dated October 27, 2019 (Ex. 7), in which he explained that he had submitted to the prison an informal complaint as well as a "'Regular Grievance': Grievance # SXII-19-INF-04780." In the letter, Plaintiff claimed that he had not received a response to this regular grievance, so he was "sending another [regular grievance] of why the

9

Informal Complaint and Regular Grievance, was writ[t]en." (Ex. 7.) Plaintiff identified Exhibit 9—the undated grievance that Langford testified was not in the prison's file— as the regular grievance form he drafted and sent to the Regional Ombudsman's office. (Tr. 55:1– 7.) Plaintiff clarified that he filled out Exhibit 9 specifically to send to the Regional Ombudsman; it was not a copy of the regular grievance he gave to Officer Callahan. (Tr. 55:1–15.)

Plaintiff testified that he received a response from Harvey in a letter dated November 1, 2019 (Ex. 6). (Tr. 55:17–23.) In that letter, Harvey stated that he "did not find any evidence that [Plaintiff's] issues had been through the institutional [i.e., prison] level of the Grievance Procedure." (Ex. 6.) The letter advised Plaintiff that the Grievance Procedure does not allow the Regional Ombudsman's office to review issues that were not properly processed at the prison (Ex. 6.)

Plaintiff testified that, in addition to sending the letter to the Regional Ombudsman's Office, he submitted an Offender Request to the prison on October 21, 2019 (Ex. 13), stating that he did not receive a response to his regular grievance. (Tr. 57:2–21; Ex. 13.) On the request, Plaintiff referred to the regular grievance as "Regular Grievance #SXII–19–INF–04780." (Ex. 13.) The prison responded to the Offender Request on October 22, 2019, stating, "Informal Complaint #SXII–19–INF–04780 Received 9/12/19 was entered [and] responded to by Unit Manager [and] closed out." (Ex. 13.) Plaintiff testified that he mailed this returned Offender Request Form to Harvey with a second letter. (Tr. 56:20–25; *see* Ex. 11.) In this second letter, Plaintiff told Harvey that he believed Sussex II was mishandling his grievances. (Ex. 11.) Harvey again responded to Plaintiff by reminding him that the Regional Ombudsman's Office cannot review issues that have not been properly processed at the prison. (Ex. 10.) Plaintiff sent a final letter to Harvey on December 20, 2019, again stating that he never received a response to his regular grievance. (Exs. 15–16.) Plaintiff testified that his letters to Harvey "show that, that [he] went to the extent and took the time to write these letters to him to let him know, like, there's nothing else [he] could do but go to the next step now." (Tr. 59:16–19.)

On cross-examination, Plaintiff was directed to review the Grievance Report. (Tr. 63:4–8; *see* Ex. 22.) Counsel for Hoover questioned Plaintiff regarding ten informal complaints listed on the Grievance Report. (Tr. 63:15–66:20.) Plaintiff agreed that he had submitted these ten informal complaints in September and October 2019, and he agreed that he received a response to each of them from the prison. (Tr. 66:16–23.) He also agreed to having submitted one regular grievance that was rejected by the prison at intake. (Tr. 66:24–67:3.) Counsel for Hoover also introduced two emergency grievances, which were stamped as received by Sussex II's

10

grievance office on October 21, 2019, and November 25, 2019 (Ex. 23), both of which include a response from the prison's staff. (Tr. 67:4–25; Ex. 23.)

### [D.] ANALYSIS

As discussed above, inmates must exhaust any available administrative remedies before filing a complaint challenging prison conditions in federal court. 42 U.S.C. § 1997e(a). To exhaust administrative remedies, inmates must satisfy the prison's grievance procedure. *Jones*, 549 U.S. at 218.

Because it is an affirmative defense, Defendant Hoover bears the burden of proving that Plaintiff failed to exhaust his administrative remedies. *See id.* at 216. "Once a defendant presents evidence of a failure to exhaust, the burden of proof shifts to the plaintiff to show, by a preponderance of the evidence, that exhaustion occurred or administrative remedies were unavailable through no fault of the plaintiff." *Lordmaster*, 2014 WL 3359389, at *1, n.2.

Here, Plaintiff's sole remaining claim in this lawsuit arises from Defendant Hoover's alleged excessive use of force on September 4, 2019, at Sussex II. Pursuant to Operating Procedure 866.1, in order to exhaust his administrative remedies, Plaintiff was first required to pursue his complaint via an informal complaint. If he was not satisfied with the outcome of that process, he was required to file a regular grievance within thirty days of the incident—by October 4, 2019— and to pursue that grievance through all levels of the appeals process. Defendant Hoover acknowledges that Plaintiff filed Informal Complaint 4780, but she has submitted testimony and evidence that no regular grievance was ever received by the prison pertaining to this incident. Plaintiff, on the other hand, testified that he attempted to exhaust his administrative remedies— first by filing Informal Complaint 4780 and then by giving a regular grievance to Officer Callahan to submit to the grievance office while he was in segregation. According to Plaintiff, the prison never responded to this regular grievance, leading him to send a new regular grievance form to the Regional Ombudsman's office. To determine if Plaintiff exhausted his administrative remedies, the undersigned must resolve this factual dispute.

The documentation and testimony presented by Defendant Hoover establish that Plaintiff did not file a regular grievance pertaining to the September 4, 2019 incident. Defendant Hoover presented a detailed Grievance Report that established that Plaintiff filed ten informal complaints during the period of September 2019 through October 2019, including Informal Complaint 4780 pertaining to Plaintiff's excessive use of force claim. (See Ex. 22.) Plaintiff agreed that each of these informal complaints was received and logged by the prison and that he received a response to each

11

of them. (Tr. 66:16–23.) In addition to the Grievance Report, Hoover also presented documents establishing that Plaintiff filed a regular grievance, which was refused at intake, and an emergency grievance during this same timeframe.[4] These forms show that the prison provided Plaintiff with a response to each of these submissions. (Ex. 19; Ex. 23.) Thus, Defendant Hoover was able to show that the prison received and addressed a number of complaints and grievances filed by Plaintiff. Additionally, for each of these forms, the prison either properly logged those forms into CORIS and provided a response and receipt; or, for those forms that, per policy, were not logged into CORIS because they were not accepted, the prison properly retained physical copies of the forms. In other words, for each of the forms submitted by Plaintiff during this period of time, the prison properly processed and responded to the forms. Furthermore, Langford, whose testimony the undersigned found credible, testified that, having reviewed the Grievance Report and Plaintiff's physical file at Sussex II, Plaintiff never filed a regular grievance regarding the September 4, 2019 incident. (Tr. 37: 18–25.)

Based on the record and testimony establishing that the prison appropriately filed and responded to a number of informal complaints and grievances submitted by Plaintiff in September and October of 2019, and the lack of evidence of Plaintiff's filing of any regular grievance by the October 4, 2019 deadline, the undersigned Court finds that Defendant Hoover met her burden of proving that Plaintiff failed to exhaust his administrative remedies. Because Defendant Hoover met her burden of proving that Plaintiff failed to exhaust his administrative remedies, the burden shifts to Plaintiff to show either that exhaustion occurred or that those remedies were unavailable to him through no fault of his own. *See Lordmaster*, 2014 WL 3359389, at *1, n.2.

Here, Plaintiff testified that he gave a regular grievance to Officer Callahan around September 26, 2019—the same day a response to his informal complaint was delivered to him. (Tr. 53:20–54:9.) However, because the regular grievance was never accepted or logged by the prison, Plaintiff contends that Sussex II officials made the grievance process unavailable to him. The undersigned does not find Plaintiff's testimony credible, and therefore Plaintiff has not shown that exhaustion occurred or that Plaintiff's administrative remedies were unavailable to him.

First, Langford's testimony—which the undersigned found credible--casts significant doubt on Plaintiff's version of events. In particular, Langford testified in detail how an inmate in segregation can submit a

---

[4] The emergency grievance received on November 25, 2019, did not fall within the September 2019 to October 2019 timeframe at issue here. Therefore, the undersigned is only considering the emergency grievance received on October 21, 2019, in its analysis.

grievance. She testified that all the necessary forms are available to inmates in segregation and that officers are constantly picking up mail from the inmates housed there. (Tr. 41:15–20.) Langford testified that there is no delay between the time that officers pick up mail from inmates in segregation and when that mail is delivered to her. (Tr. 41:21–24.) In fact, she stated that she had never experienced a delay in receiving mail from an inmate in segregation. (Tr. 41:25–42:2.) Bolstering Langford's testimony is the fact that most—if not all—of the informal complaints listed on the Grievance Report during the relevant timeframe were also submitted while Plaintiff was in segregation, and the prison received and logged each of those.[5] (Ex. 22.) There is no reason to conclude that the regular grievance at issue would not have also arrived in Langford's mail.

Second, the undersigned finds that Plaintiff's testimony that he gave Officer Callahan a regular grievance lacks credibility.[6] Throughout his testimony, Plaintiff was adamant that he was knowledge [sic] about the grievance procedure deadlines and their significance. Plaintiff testified, "I've been incarcerated 15 years so I know the procedures. I know deadlines are crucial. I know that the proper step has to be followed." (Tr. 56:7–11.) His history of submissions of informal complaints, regular grievances, emergency grievances, and offender requests support Plaintiff's assertion. Plaintiff clearly understood the grievance procedures and requirements, and effectively navigated the system. Yet despite testifying that he had a firm intention to meet the required deadlines concerning the September 4, 2019 incident, he took no action between September 26, 2019 (the date he testified he gave the regular grievance to Officer Callahan) and October 21, 2019 (the date he submitted an Offender Request form stating that he had not received a response to "Regular Grievance #SXII–19–INF–04780"). (See Ex. 11.) Thus, Plaintiff waited two and a half weeks after the deadline for the submission of a regular grievance and three and a half weeks since he allegedly gave Officer Callahan the regular grievance—before taking any action. This is notable because Plaintiff testified that he knew the deadlines and procedures. He knew that he should have received a receipt or response soon after the submission of his regular grievance, and testified that he never

---

[5] It is unclear exactly how long Plaintiff was in segregation, but based on the evidence submitted, it appears he was in segregation at least through October 27, 2019. (See Ex. 7 (writing on October 27, 2019: "I find myself in solitary confinement . . . at Sussex II state prison.").)

[6] Plaintiff did not attempt to have Officer Callahan testify as a witness. (See ECF Nos. 61, 62.)

received either.[7] Further, Langford testified that Plaintiff could have taken steps to check the status of his grievance by submitting a request or sending an inquiry to her office, (Tr. 48:4–25), but Plaintiff did not do so. Taken together, these delays and inaction suggest that Plaintiff never filed a regular grievance regarding this incident, and, when he realized this failure after his October 4, 2019 deadline expired, he started taking actions to make it appear that the prison failed to received and process his regular grievance.

Finally, while the Court recognizes that if Plaintiff's testimony were credited there would be no documentary evidence that he handed Officer Callahan a regular grievance, it is at least worth noting that there is an absence of any documentary evidence supporting Plaintiff's testimony. Although Plaintiff introduced a regular grievance form pertaining to this issue, Plaintiff testified that this regular grievance was not the one that he gave to Officer Callahan. Instead, it was one that he wrote specifically to send to the Regional Ombudsman in order to explain his complaint.[8] (Ex. 9; Tr. 55:1–15.) Because grievances must first be processed at the facility level,

---

[7] Plaintiff indicated that he thought that he may not have received a response because he moved cells after receiving medical attention at the hospital. (Tr. 62:12–23.) Langford also indicated that mail could be disrupted when a prisoner moves cells. (Tr. 48:15–17.) However, Langford testified that, even though the policy required that she send a receipt for a grievance accepted at intake within two days, she "always give[s] [her] receipts the same day," meaning that she would place them "directly into the mail bags so that they go back to the buildings that day." (Tr. 40:12–15.) This allows the prisoner to get the receipt or notice of rejection at intake either that same day or the following day. (Tr. 40:16–19). Given the very short time frame between the alleged submission and the return of a receipt or rejection, Plaintiff's theory is unlikely and he has presented no evidence that he was taken to the hospital immediately after he gave the regular grievance to Officer Callahan. But regardless, Plaintiff's explanation does not bolster his testimony. Without having received a receipt or notice of rejection at intake, Plaintiff could not know whether his regular grievance was accepted at intake. Thus, this lack of information should have caused him to inquire further, which he did not do.

[8] When this Court denied Defendant Hoover's Motion for Summary Judgment, the Court noted that the record contained a regular grievance form that was stamped as 'RECEIVED' on November 1, 2019. *Duran*, 2022 WL 319834, at *3. The Court stated that the stamp made it appear that the regular grievance was received by prison officials on that date. *Id.* Although it was ambiguous at the time of Defendant Hoover's Summary Judgment Motion, Plaintiff's testimony at the evidentiary hearing establishes that the regular grievance that was stamped November 1, 2019 (Ex. 9), was never submitted to officials at Sussex II but rather was drafted and submitted only to the Regional Ombudsman's Office. When viewed together with Plaintiff's letter to the Regional Ombudsman and in consideration of his testimony, it is clear the November 1, 2019 stamp, was made by the regional ombudsman's office and not the prison.

14

sending this grievance form to the Regional Ombudsman did not satisfy the administrative requirements. (Tr. 24:25–25:9.)

Accordingly, for these reasons, the undersigned finds that Plaintiff failed to exhaust his administrative remedies and that those remedies were available to him. Plaintiff failed to submit a regular grievance regarding the September 4, 2019 incident by the October 4, 2019 deadline as required to exhaust his administrative remedies. As a result, the undersigned recommends that judgment be entered in favor of Defendant Hoover.

### PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

In addition to the above summary and analysis, the undersigned submits the following formal factual findings, conclusions, and recommendations:

1. In order to exhaust his administrative remedies, Plaintiff was required to file a regular grievance pertaining to the September 4, 2019 incident by October 4, 2019—30 days following the date of the incident—and pursue that grievance through all available levels of appeal.
2. Plaintiff never submitted a regular grievance pertaining to the September 4, 2019 incident to Sussex II that was accepted at intake and appealed through all available levels of review.
3. Plaintiff did not give a regular grievance pertaining to the September 4, 2019 to Officer Callahan to submit to the prison.
4. Plaintiff failed to exhaust his administrative remedies prior to filing suit in this Court.
5. There is no evidence that the administrative process was made unavailable to Plaintiff.

### [E.] CONCLUSION

For the reasons stated above, it is RECOMMENDED that the Court enter judgment in favor of Defendant Hoover because Plaintiff did not exhaust his available administrative remedies.

(R&R, at 1–21 (all alterations in original, except alterations to section headings).)

## II. STANDARD OF REVIEW

"The magistrate makes only a recommendation to this court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with this court." *Estrada v. Witkowski*, 816 F. Supp. 408, 410 (D.S.C. 1993) (citing

*Mathews v. Weber*, 423 U.S. 261, 270–71 (1976)). This Court "shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). "The filing of objections to a magistrate's report enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute." *Thomas v. Arn*, 474 U.S. 140, 147 (1985). "[W]hen a party makes general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations," *de novo* review is unnecessary. *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982) (citations omitted).

### III. DURAN'S OBJECTIONS

Duran's two-paragraph "OBJECTION/MOTION TO RECONSIDER" (ECF No. 69) is precisely the sort of "general and conclusory objection[]" that does not warrant *de novo* review, because it "do[es] not direct the court to a specific error in the magistrate's proposed findings and recommendations." *Orpiano*, 687 F.2d at 47 (citations omitted). The unsigned and undated "Affidavit" that Duran submitted on the same day as his "OBJECTION/MOTION TO RECONSIDER" is similarly deficient. (ECF No. 70.)

In this instance, the Magistrate Judge made a number of pivotal credibility determinations. For instance, the Magistrate Judge specifically found Langford to be a credible witness. (R&R at 16.) Conversely, the Magistrate Judge found that Duran's testimony was not credible. (*Id.* at 17.) The Magistrate Judge found that Duran did not give his regular grievance to Officer Callahan, despite his testimony to the contrary. (*Id.* at 20.) The Magistrate Judge further found that when Duran realized he missed the filing

16

deadline for a regular grievance, "he started taking actions to make it appear that the prison failed to receive[] and process his [non-existent] regular grievance." (*Id.* at 19.) Duran does not directly or specifically allege that the Magistrate Judge erred in making any of these credibility determinations or factually findings. Nor does he specifically argue that the Magistrate Judge erred by concluding that the prison's administrative remedy system was available to Duran. (*See id.* at 17, 20.)

Indeed, at no point in either of his submissions does Duran directly state that the Magistrate Judge erred in any discernable way in her factual findings or conclusions, much less identify precisely how the Magistrate Judge purportedly erred. Rather, in his affidavit, Duran reasserts factual allegations and recycles legal arguments that he already presented to the Court. This is insufficient to state a specific objection to the R&R. *See United States v. Wearing*, No. 3:04–cr–00092, 2011 WL 918343, at *2 (W.D. Va. Mar. 15, 2011) (observing that when a party "reiterat[es] arguments already presented" it has "the same effect as a failure to object" (citing *Orpiano*, 687 F.2d at 47; *Veney v. Astrue*, 539 F. Supp. 2d 841, 845–46 (W.D. Va. 2008))).[9] Therefore, the Court is not required to conduct a *de novo* review of the record.

Even though the Court is not required to conduct a *de novo* review in this instance, the Court has reviewed the record *de novo*, including the transcript of the evidentiary

---

[9] For example, Duran restates his prior allegation that he handed a regular grievance to Officer Callahan on September 27, 2019. (ECF No. 70 at 2.) However, Duran does not specifically address the Magistrate Judge's finding that his testimony on this point was unbelievable, much less explain how the Magistrate Judge was wrong. Simply put, it was incumbent upon Duran to do more in filing his objection than merely repeat to this Court what he had already said to the Magistrate Judge. *See Wearing*, 2011 WL 918343, at *2.

hearing held on July 19, 2022 (ECF No. 67), and it finds that the Magistrate Judge properly evaluated the evidence, made reasonable credibility determinations, made reasonable factual findings, and properly concluded that Duran failed to exhaust his administrative remedies prior to filing suit, as required by the PLRA. Accordingly, Duran's Objection to the R&R will be overruled, his request for reconsideration will be denied, and the R&R will be accepted and adopted.

## IV. CONCLUSION

Duran's Objection (ECF No. 69) will be overruled. Duran's Motion for Reconsideration (ECF No. 69) will be denied because the Magistrate Judge properly concluded that Duran failed to exhaust his administrative remedies. Duran's Motion for a *Subpoena Duces Tecum* (ECF No. 71) will also be denied.[10] The R&R (ECF No. 68) will be accepted and adopted. Duran's sole remaining claim against Defendant Hoover and this action will be dismissed with prejudice because Duran failed to properly exhaust his administrative remedies, as required by the PLRA.[11]

---

[10] As the Court has previously explained (*see* ECF No. 45 at 2–3), discovery is to be conducted on an informal basis. No motion concerning discovery may be filed with the Court until the parties have made a good faith effort to resolve all legitimate discovery disputes. *See* E.D. Va. Loc. Civ. R. 37(E). The requesting party must also certify that a good faith effort has been made to resolve the discovery matter at issue by conferring with opposing counsel regarding the resolution of such matters prior to filing a motion. Fed. R. Civ. P. 37(a)(1). Duran fails to indicate that he attempted to confer with counsel for Defendant Hoover.

[11] Under the PLRA, the normal remedy for a failure to exhaust is dismissal without prejudice. *See, e.g., Booth v. Churner*, 532 U.S. 731, 735 (2001). However, "dismissal with prejudice may be appropriate where exhaustion was required but administrative remedies have become unavailable after the prisoner had ample opportunity to use them, and no special circumstances justified failure to exhaust." *McCoy v. Abbasi*, No. 3:11CV09, 2012 WL 6562759, at *7 (E.D. Va. Dec. 14, 2012) (citations and internal quotation marks omitted). Duran's time for pursuing a regular grievance against Defendant Hoover based on the events underlying this case has long since expired. *See* Operating Procedure § 866.1.III.B.5 (observing that regular grievance must

An appropriate Final Order will accompany this Memorandum Opinion.[12]

/s/
Henry E. Hudson
United States District Judge

Date: Oct. 27, 2022
Richmond, Virginia

---

be submitted "within 30 days from the original incident . . . ."). Because Duran has failed to demonstrate that any special circumstances exist to justify his failure to timely exhaust his administrative remedies, his claim against Defendant Hoover will be dismissed with prejudice. *See McCoy*, 2012 WL 6562759, at *7.

[12] In a letter received by the Court on September 2, 2022, Duran asked who he could write to get a transcript of the evidentiary hearing that was held on July 19, 2022. (ECF No. 72.) Parties may obtain copies of transcripts by contacting the appropriate court reporter and purchasing a copy of the requested transcript. If the proceeding has been previously transcribed, then the cost is 90 cents per page. If the proceeding has not been previously transcribed, then the cost is $3.65 per page. Court reporters generally require payment in advance.